## Shrout's Adm'r v. Vaughan.

May 30, 1947.

Rehearing denied November 14, 1947.

Watt M. Prichard, Judge.

John C. Clarke for appellant.

C. F. See, Jr. and Diederich & Lycan for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

This equity action was filed in the Lawrence circuit court by F. H. Vincent, administrator of M. M. Shrout, deceased, against Mrs. Rose Vaughan on August 16, 1944. Plaintiff sought to recover from defendant $1,600 with interest from September 27, 1941, evidenced by a note of defendant to decedent and secured by a mortgage on her dwelling house and lot in Louisa, Kentucky, which she executed on the same day; but which he never put to record. He died May 10, 1944, and nineteen days

thereafter plaintiff was appointed administrator of his estate. The First National Bank of Louisa was made a defendant because it held a mortgage lien on the same property which was inferior in date to that of the decedent's, but he by writing, relinquished his superior lien and consented that the lien of the bank (also a defendant) might be superior to his. Mrs. Vaughan made no defense to the bank's indebtedness, but in her answer she admitted the execution of the note to decedent and the mortgage to secure it, but alleged that the note was without consideration, thus forming the only issue to be tried by the court, there being no legal issue presented. Upon final submission the court sustained defendant's plea of no consideration and dismissed the petition, from which plaintiff prosecutes this appeal.

In determining that issue we are first met with the presumption of universal application that an admitted and duly executed writing is supported by a legal consideration, and the burden is cast on the one executing it to overcome that presumption.

The undisputed testimony given at the trial and denied by no one (but admitted by defendant) was that her husband died in 1937 and for some six or seven years prior to that time the decedent, who was a single man, occupied a room in the residence occupied by her and her husband. There developed a friendship between her and decedent finally culminating in their engagement to be married, but he died before it was consummated. The title to the residence was in the name of the defendant, and after her husband's death—who was indebted some nine or ten thousand dollars—she confided the management of her property, its upkeep, etc. entirely to the deceased, her fiance, who appears to have been an active business man of at least average ability. For some time prior to his death, the exact date not being shown, he left Louisa and of course, abandoned the quarters he had formerly occupied in defendant's residence, and moved to Ashland, but continued to look after the affairs of the defendant who shortly following her husband's death, engaged in different work, part of the time being an employee of the WPA located in Louisville, and at other times in Winchester, Kentucky, and lastly in Huntington, West Virginia, where she was employed at other

work, and where she was living at the time of the death of Shrout.

After the appointment of plaintiff as administrator of Shrout, he opened a deposit box of decedent which was in the Second National Bank of Ashland and found therein the note and mortgage sued on, but the mortgage had not been recorded and the administrator immediately recorded it in the proper office. He wrote a letter to Mrs. Vaughan, and the other debtors of decedent, of their indebtedness to his decedent requesting payment. Soon thereafter defendant and her brother-in-law, one Carl Picklesimer, visited plaintiff in his office and in the ensuing conversation plaintiff testified that "she stated that she had no money but that she would contact me later and see what could be worked out. She also stated that she and Mr. Shrout were very close friends and possibly had been sweethearts."

Plaintiff heard no more from her and later wrote her this letter: "Will you kindly advise me what you intend to do in reference to the note and mortgage which I hold against you in favor of M. M. Shrout?" He received an answer dated June 24, 1944, which said, in part:

"I have not been able to do much in regard to the matter as I have been ill for the last two weeks, but I am having a vacation beginning the 10th of July at which time I will go into this and do the best I can with it.

"I have absolutely nothing but this home and what I work for each day in a shop here in Huntington.

"It was Mr. Shrout's and my understanding that the home was to be our home and the mortgage was never mentioned between us from the day it was made. The first I had ever heard of it from that day was the day I received your letter after his death. As you know, it was never recorded in the court house at Louisa until it was put there after his death.

"I hate very much to part with my home as it means more to me than it could any one else but will do the very best I can as soon as possible."

As already stated she admitted the execution of both the note and the mortgage to secure it, but she,

neither in the conversation she had with plaintiff with reference to the indebtedness, nor in the letter she wrote him, even remotely intimated that the note was without consideration. On the contrary in her letter it appears that she was of the impression that the failure of decedent to record the mortgage rendered it, as well as the indebtedness it purported to secure, of no effect by saying therein that "it was never recorded in the court house at Louisa until it was put there after his (decedent's) death." (Our parenthesis.)

During the time of the transactions referred to and after the death of defendant's husband, one Vantilburg was a tenant occupying defendant's residence. There were some negotiations between them relating to the purchase of the property by the tenant, and after plaintiff received defendant's letter of June 24, the tenant visited plaintiff and made inquiry about defendant's mortgage to secure the indebtedness sued on, and in that conversation he (the negotiating tenant) offered Mr. Vincent $1,500 in settlement of the indebtedness. The offer must have been made in accordance with instructions from defendant, but which plaintiff declined to accept, and the negotiation for the sale of the property to him was abandoned.

In giving her testimony defendant testified that she never received any part of the cash proceeds of the note sued on, but she did not state that her fiance, who was manager of her property, had not expended out of his own funds that amount for repairs and improvements of the property, or perhaps in payment of other indebtedness of defendant, or that of her deceased husband, her only claim being that she, herself, never handled the proceeds.

Before this action was filed, and after receiving plaintiff's letter of June 24, 1944, appellee called on Kit Carson Elswick, a practicing attorney in Louisa, Kentucky, who was formerly employed in some litigation involving the settlement of the estate of her husband, and in that litigation she denied having signed a mortgage to some bank to secure a debt of her husband. But upon being shown the mortgage she acknowledged her signature. Her purpose in making that call was to consult the attorney about the indebtedness sued on

herein and—quoting from her testimony—she said: "I told Kit I understood Mr. Vincent had a mortgage against my home and I said I couldn't imagine what it is unless it is the old Phil Preece note and I asked if there was anything I could do and he said absolutely nothing. And I said, 'Kit, that mortgage was never recorded and was to never be recorded * * *'."

Later on in her testimony she was asked whether or not she told plaintiff that the note sued on had never been paid, to which she gave an affirmative answer, and added: "I told him I had never had a chance to pay it or the interest on it." But she did not then, nor at any time, deny owing it. In a visit to consult attorney Elswick (there appearing to have been more than one) she asked him, in substance, if she sold her property to her tenant would that relieve it of the encumbrances of the mortgage sued on, to which he gave a negative answer, since the tenant knew of the existence of the mortgage, notwithstanding that it had not been recorded. Either on the same occasion—or another one when her daughter was present—defendant inquired of the same attorney whether or not she could sell her home to her daughter and thereby eliminate decedent's mortgage, to which the attorney also gave a negative answer. Elswick not only testified to the above, but also to a conversation he had with both defendant and the decedent, both being present, before the latter's death concerning the note and mortgage sued on herein. He testified that it "was my information about it that this $1,600 mortgage, $1,300 of it was to pay off the judgment that I mentioned a while ago, in the Lawrence circuit court, and $300 of it was for repairs on the house in question."

C. A. Lycan, one of the attorneys for appellant, was introduced by plaintiff. He testified that on or about the time of the transaction here involved he was attorney for the defendant, First National Bank of Louisa, and that he prepared the mortgage on defendant's house and lot which she executed to that bank to secure its indebtedness supra, and which it asserted in this action. He testified that at that time he also drew the writing signed by decedent, referred to above, whereby he waived his first and superior lien on the property in favor of that bank, and thereby consented for his lien

to become a second encumbrance upon the property. Witness further stated that he was of the opinion that he drew the mortgage to secure the $1,600 sued on, and that the matter was discussed in his office between him, the decedent and the defendant, and at that time "they (defendant and decedent) said that they had an understanding among themselves in regard to that, and that they would do whatever was necessary about that, and I think it was my suggestion that they draw this waiver and let him sign that waiver." (Our parenthesis.)

There is more testimony in the record negativing the defense action of no consideration than what we have related and to which we have not specifically referred because it is unnecessary and would unduly lengthen this opinion. Suffice it to say that appellee contradicted herself as to her knowledge of the existence of the note and mortgage sought to be enforced herein. She stated that she was first informed thereof by plaintiff after his appointment as administrator of decedent's estate. She told the witness, Elswick, that which we have hereinbefore quoted. The witness, Lycan, testified that to his best recollection the note and mortgage were drawn in his office by him in the presence of both Mrs. Vaughan and the decedent. She acknowledged the mortgage and executed the note and gave her testimony in this case a little more than three years thereafter when she claimed that she had no knowledge as to the purpose of either herself or of the decedent as to why she did so. Her testimony as to her ignorance of the purpose to be accomplished by her executing the two instruments is preposterous since no one of ordinary intelligence (which her testimony indicates she has) would voluntarily incur an indebtedness of $1,600 without knowing what it was for. Her entire testimony indicates that she was under the impression that if the mortgage had not been recorded neither it nor the note was enforcible. It is therefore clear that she failed to discharge the burden which the law cast upon her to prove that the documents were without consideration, the rule being that the necessary proof to sustain that burden should be clear and convincing and which requirement has been many times approved by this court. A comparatively late case in which it was done is Cheney's Adm'r v. Houston et al., 238 Ky. 410,

38 S. W. 2d 198, in which prior cases to the same effect are cited.

In an effort to bolster her defense of no consideration a slight effort was made to show that the obligations sought to be enforced herein were only for the purpose of indemnifying the decedent against loss as surety on a note executed by appellee to the Louisa National Bank for $1,000. But that contention is utterly unsustainable when it is remembered that such an indemnity does not require the execution of a note in order to effectuate the purpose intended, since the amount that the surety may be compelled to pay is altogether contingent. Moreover, the surety obligation of the decedent was only to the extent of $1,000, whilst the note herein, secured by the mortgage, was 60% more than the note to the Louisa National Bank on which decedent was appellee's surety.

The proof shows that the bank accounts of decedent and of defendant (at only one bank) showed that decedent did not have on deposit therein at the time of the date of defendant's $1,600 note, a sufficient balance to furnish her that amount, nor did her bank account show the deposit of any such amount. But such proof is evasive and by no means conclusive. We have seen that the indebtedness of defendant's husband at the time of his death was something near $10,000. It does not appear whether his indebtedness was paid, or if so by whom or how it was paid. The decedent pursued in his lifetime various occupations among which was operator for oil, a dealer in liquor, and when he died (which was the result of an automobile accident) he was a detective for the C. & O. Ry. Co. He had no dependents and the only demands on his finances were his living expenses. He could easily have accumulated enough funds to advance to defendant, his fiancee, of whose business affairs he was manager, the amount of the note sued on, or he might have from time to time expended in discharging obligations for which she was liable amounts aggregating the amount of the note.

Viewing the testimony in its entirety we are unable to arrive at any other conclusion than that appellee failed to sustain the burden which the law cast upon her to prove her only defense, and that the court erred

in arriving at a different conclusion. In so determining we are fully aware that the fact finding of a chancellor will not be disturbed by this court when we entertain only a doubt as to its correctness. However, when we conclude that the testimony creates more than a mere doubt as to the chancellor's finding, it then becomes our duty to determine the issue according to the preponderance of the proof.

Wherefore the judgment is reversed with directions to set it aside and to enter one sustaining the prayer of plaintiff's petition, and for other and necessary orders consistent with this opinion.